JS-6

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **EDCV 20-1016 JGB (SHKx)** | Date | July 20, 2022 |
|---|---|---|---|
| Title | ***Cristie Ramirez v. HB USA Holdings, Inc.*** | | |

Present: The Honorable   JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

Proceedings:   **Order (1) GRANTING Plaintiffs' Motion for Final Approval of Class Action Settlement (Dkt. No. 54); (2) GRANTING IN PART Plaintiff Cristie Ramirez's Motion for Attorney's Fees and Costs (Dkt. No. 55); and (3) GRANTING Plaintiff Natalie Linarte's Motion for Attorney's Fees and Costs (Dkt. No. 57).**

Before the Court is Plaintiffs Cristie Ramirez and Natalie Linarte's (collectively, "Plaintiffs") unopposed motion for final approval of class action settlement ("MFA," Dkt. No. 54), Ms. Ramirez's motion for attorneys' fees ("Ramirez Fee Motion," Dkt. No. 54), and Ms. Linarte's motion for attorney's fees ("Linarte Fee Motion," Dkt. No. 57) (collectively, "Motions"). On May 2, 2022, the Court held a hearing on the Motion and ordered Plaintiffs' counsel to file evidence of the reasonableness of the attorneys' fee request. On June 13, 2022, the Court held a final approval hearing. Upon consideration of the papers filed in support of and in opposition to the Motions, as well as oral argument, the Court GRANTS the MFA, GRANTS IN PART the Ramirez Fee Motion, and GRANTS the Linarte Fee Motion.

## I.  BACKGROUND

On May 12, 2020, Ms. Ramirez filed a complaint against Defendant HB USA Holdings, Inc. d/b/a Huda Beauty ("Huda Beauty") on behalf of a putative class. ("Complaint," Dkt. No. 1.) On November 20, 2020, Ms. Ramirez filed a motion to consolidate this action with a subsequently filed putative class action, Linarte v. HB USA Holdings, Inc., Case No. 2:20-cv-09748-JGB-SHKx (filed on October 23, 2020). (Dkt. No. 26.) On January 15, 2021, the Court granted the motion to consolidate, consolidated the Ramirez and Linarte actions into one action, and granted Plaintiffs leave to file a consolidated complaint. (Dkt. No. 34.)

On January 25, 2021, Plaintiffs filed a consolidated complaint, which is the operative complaint.  ("Consolidated Complaint," Dkt. No. 35.)  The Consolidated Complaint asserts nine causes of action: (1) breach of implied warranty; (2) unjust enrichment (in the alternative); (3) violation of California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500, et seq.; (4) violation of California's Legal Remedies Act ("CLRA"), Cal. Bus. & Prof. Code § 1750, et seq.; (5) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, et seq.; (6) common law fraud; (7) negligent failure to test; (8) negligent failure to warn; and (9) strict liability – defective design and/or manufacture.  (See Consolidated Compl.)

On July 9, 2021, Plaintiffs filed an unopposed motion for preliminary approval of class action settlement.  ("MPA," Dkt. No. 48.)  The Court granted the MPA on August 13, 2021.  ("MPA Order," Dkt. No. 50.)  In the MPA Order, the Court certified a Settlement Class; appointed Peter J. Farnese of Beshada Farnese LLP and William A. Ladnier, Jonathan B. Cohen, Alex R. Straus, and Caroline Ramsey Taylor of Milberg Coleman Bryson Phillips Grossman, PLLC ("MCBPG") as Class Counsel; appointed Ms. Ramirez and Ms. Linarte as class representatives; appointed Digital Settlement Group as the settlement administrator; approved the Class Notice form; and authorized the mailing of Class Notice forms.  (Id. at 12–13.)  The Court set the final fairness hearing for Monday, February 21, 2022.  (Id. at 13.)

On December 14, 2021, the Court approved the parties' stipulation to continue the final fairness hearing to Monday, March 21, 2022.  (Dkt. No. 53.)  On March 4, 2022, the Court approved a second stipulation by the parties to continue the final fairness hearing to Monday, April 18, 2022 at 9:00 a.m.  (Dkt. No. 64.)

On December 17, 2021, Plaintiffs filed the MFA.  (See MFA.)  In support, Plaintiffs filed the following documents:

- Declaration of Peter J. Farnese in support of the MFA ("Farnese MFA Declaration," Dkt. No. 54-2);
- Settlement Agreement ("Agreement," Farnese MFA Decl., Ex. 1);
- Declaration of Jonathan B. Cohen ("Cohen Declaration," Dkt. No. 54-4); and
- Declaration of Mark Schey ("Schey Declaration," Dkt. No. 54-5), with attached exhibits.

Huda Beauty does not oppose the MFA.  Plaintiffs filed a reply on April 4, 2022.  ("MFA Reply," Dkt. No. 71.)  On April 14, 2022, Plaintiffs filed a supplemental declaration of Mr. Schey.  ("Supplemental Schey Declaration," Dkt. No. 74.)

On December 17, 2021, Ms. Ramirez filed the Ramirez Fee Motion.  (See Ramirez Fee Mot.)  In support, Ms. Ramirez filed the following documents:

- Declaration of Alex R. Straus ("Straus Declaration," Dkt. No. 55-1); and
- Firm resumes (Dkt. Nos. 55-2, 55-3, 55-4).

On February 28, 2022, Huda Beauty opposed the Ramirez Fee Motion. ("Ramirez Fee Mot. Opp'n," Dkt. No. 60.) In support, it filed the following documents:

- Declaration of Christopher Chorba ("Chorba Declaration," Dkt. No. 60-1), with attached exhibits; and
- Declaration of Thomas Cochrane ("Cochrane Declaration," Dkt. No. 60-7).

On March 7, 2022, Ms. Ramirez replied. ("Ramirez Fee Mot. Reply," Dkt. No. 65.) She also filed a second declaration from Mr. Straus. ("Second Straus Declaration," Dkt. No. 65-1.)

On March 24, 2022, Huda Beauty, with the Court's leave, filed a sur-reply to the Ramirez Fee Motion Reply. ("Ramirez Fee Mot. Sur-Reply," Dkt. No. 70.)

On December 17, 2021, Ms. Linarte filed the Linarte Fee Motion. (See Linarte Fee Mot.) In support, Ms. Linarte filed the declaration of Peter J. Farnese in support of the Linarte Fee Motion ("Farnese LFM Declaration," Dkt. No. 57-2), with attached exhibits. On February 28, 2022, Huda Beauty filed a notice of non-opposition to the Linarte Fee Motion. ("Linarte Fee Mot. Non-Opp'n," Dkt. No. 61.)

On March 2, 2022, the Court held a hearing on the Motions and ordered Class Counsel to submit timesheets and other documentation in support of their request for attorneys' fees. (Dkt. No. 77.) In response, Plaintiffs filed supplemental declarations on May 13, 2022. ("Joint Response to Court's Order to Supplement Fee Motions," Dkt. No. 81.) In support, Plaintiffs filed the following documents:

- Declaration of Mr. Straus in support of the Response, with attached exhibits ("Straus Joint Response Declaration," Dkt. No. 81-1); and
- Declaration of Mr. Farnese in support of the Response, with attached exhibits ("Farnese Joint Response Declaration," Dkt. No. 81-5).

On May 20, 2022, Huda Beauty, with the Court's leave, filed its response to the Joint Response. ("HB Response," Dkt. No. 82.) On May 27, 2022, Plaintiffs filed respective replies to the Huda Beauty Response. ("Linarte Reply," Dkt. No. 83; "Ramirez Reply," Dkt. No. 84.)

On June 13, 2022, the Court held a final approval hearing on the Motions. (Dkt. No. 39.) The Court noted that it planned to approve the MFA and Linarte Fee Motion, but ordered Huda Beauty's counsel to file any final reports from the Settlement Administrator by June 17, 2022, and ordered counsel for Ms. Ramirez ("Ramirez Counsel") to file documentation of its litigation costs in support of the Ramirez Fee Motion. (Id.) On June 14, 2022, Ramirez Counsel submitted its costs breakdown. (Dkt. No. 90.) On June 17, 2022, Plaintiffs filed a second supplemental declaration of Mr. Schey to provide a final update on claims administration. ("2d Suppl. Schey Decl., Dkt. No. 91.)

//

## II.  THE SETTLEMENT AGREEMENT

The Agreement resolves Plaintiffs' consolidated actions alleging claims that Huda Beauty misrepresented and omitted material information in the advertising, marketing, and labeling of its "Neon Obsessions" makeup palettes ("Products").  (MFA at 1.)  The parties finalized and executed the Agreement on June 12, 2021.  (Id. at 5.)  Its terms are described below.

### A.  Settlement Summary

The Agreement provides Class Members with cash payments and injunctive relief:

- "Full Refund" Cash Payments:  Class Members who receive direct notice or provide proofs of purchase may claim cash payments of $29.00 per Product, up to three Products for a maximum total payment of $87.00.  (Agreement ¶¶ 5.1.1-5.1.2.)  Class Members without a proof of purchase may claim cash payments of $10.00 per Product, up to three Products for a maximum total payment of $30.00.  (Id. ¶ 5.1.3.)

- Injunctive Relief: Huda Beauty has represented that it no longer sells the Products in the United States.  (Id. ¶ 5.2.)  If, however, Huda Beauty re-releases the Products, or any substantially similar products, it will add clear and prominent disclosures to future advertising and labeling of those products.  (Id.)

Huda Beauty will pay the costs of settlement notice and administration up to $545,000, plus any actual postage or check processing.  (Id. ¶ 6.1.)  While the Agreement does not specify an amount for attorneys' fees or costs, Huda Beauty agrees to pay such fees and expenses in the amount that the Court awards to Plaintiffs' Counsel.  (Id. ¶ 8.1.)  Apart from the cash payments described above, Ms. Ramirez and Ms. Linarte will not receive separate service awards.  (Id. ¶ 8.3.)

### B.  Financial Terms

#### 1.  Settlement Class Members

The Agreement defines "Settlement Class" as "[a]ll persons residing in the United States (including all territories and/or possessions) who purchased the Products for personal use (and not for resale) through the date of Preliminary Approval."  (Agreement ¶ 1.28.)  "Products" means Huda Beauty's "Neon Obsession Palette – Neon Green," "Neon Obsession Palette – Neon Pink," and "Neon Obsession Palette – Neon Orange" products.  (Id. ¶ 1.21.)

#### 2.  Payment and Distribution of Funds

Subject to final approval, Huda Beauty must deliver the settlement funds to the Settlement Administrator on the later of: (a) twenty-one calendar days after the time for appeal or writ of the Final Approval Order and Final Judgment has expired; or (b) if there is an appeal

and the Settlement is affirmed, within thirty calendar days after the expiration of the last day after the time for hearing, appeal, or writ of certiorari has expired.  (Id. ¶ 6.11.)

The Settlement Administrator must hold these funds to a non-interest-bearing account. (Id. ¶ 6.12.)  Within twenty-one calendar days after receiving the Settlement Funds, the Settlement Administrator will substantially complete issuance of the payments to Class Members with approved claims.  (Id. ¶ 6.13.)  Class Members may choose to receive claims payments via digital payments (e.g., PayPal, Venmo, etc.), or a traditional paper check.  (Id. ¶ 5.1.4.)  If a Class Member elected for electronic distribution, but such distribution method is not available for that Member, the Settlement Administrator will mail a check if there is a valid mailing address for that Member.  (Id. ¶ 6.13.)

### 3.  Class Representative

The Agreement does not provide for an incentive award for the class representatives. (Agreement ¶ 8.3.)

### 4.  Settlement Administration Costs

The Court appointed Digital Settlement Group ("DSG") as the Settlement Administrator.  (MPA Order at 13.)  Huda Beauty will pay the Settlement Administrator's costs, up to $545,000.00.  (Agreement ¶ 6.1.)  Through June 16, 2022, DSG has incurred $414,412.37 in notice and administration costs.  (2d Suppl. Schey Decl. ¶ 8.)  DSG estimates that it will incur $499,814.07 in total settlement administration costs based on current distribution projections, subject to increase or decrease but not to exceed $545,000.00.  (Id.)

### 5.  Attorneys' Fees and Costs

As noted above, Huda Beauty agrees to pay for attorneys' fees and expenses to Plaintiffs' Counsel in the amount awarded by the Court.  (Agreement ¶ 8.1.)  The Agreement does not specify an agreed-upon amount.  (Id.)

## C.  Injunctive Relief

The Agreement includes injunctive relief.  While the Products at issue are no longer for sale in the United States, if Huda Beauty re-releases the Products, or any substantially similar products, it agrees to:

(a) include a visible disclosure on the packaging of U.S. Products, stating: "*WARNING for U.S. Customers: may contain color additives that are not approved by the F.D.A. for use in the eye area" or similar language, to the extent consistent with current regulatory guidance in the United States;

//

(b) append an asterisk "*" symbol to each specific shade at issue that links to the above disclaimer;

(c) include the disclosure on the U.S. version of its website; and

(d) include the disclosure specified in (a) on all U.S.-facing marketing and advertising where the Products are shown being used around the eye.

(Id. ¶¶ 5.2.1–5.2.2.)  These provisions will remain in place for five years, or until changes in either the formulation or manufacture of the Products or applicable laws and regulations render the above requirements inapplicable—whichever is earliest.  (Id. ¶ 5.2.3.)

**D.  Release**

All Class Members agree to release all claims against Huda Beauty that were made or could have been made in the Consolidated Complaint.  (Id. ¶¶ 9.1, 9.4.)  This excludes personal injury claims.  (Id.)  Named Plaintiffs agree to a broader release, including claims related to personal injury, such as eye irritation.  (Id. ¶ 9.2.)  Neither Class Members nor Named Plaintiffs release any claims related to the continued enforcement of the Agreement or any other Court orders.  (Id. ¶¶ 9.1–9.2.)

**E.  Notice**

In the MPA Order, the Court authorized distribution of Class Notice to Class Members pursuant to the Agreement.  (MPA Order at 13.)  The Agreement provides that Class Notice would occur through (a) direct email and mail notice, (b) publication notice via internet advertisements, (c) a press release, and (d) settlement website.  (Agreement ¶ 6.2.)  The Settlement Administrator would distribute notice using contact information in Huda Beauty's possession for its purchasers and subpoenaed contact information produced by Sephora USA ("Sephora").  (MPA Order at 5.)  Following notice, Class Members who wished to receive a cash payment were required to submit a Claim Form within 90 calendar days from the notice date, which certified that they purchased the Products for individual use in the United States.  (Agreement ¶¶ 6.3, 6.4.)  Class Members had until the same date to request to opt out or file objections with the Court.  (Id. ¶¶ 6.5-6.6.)

Plaintiffs have submitted a declaration by the Settlement Administrator with the MFA.  (See Schey Decl.)  The Settlement Administrator declares that DSG completed the following notice procedures:

Direct Email and Mail Notice: DSG received data for 10,568 Class Members from Huda Beauty and 76,546 Class Members from Sephora.  (Id. ¶¶ 20–21; Farnese MFA Decl. ¶¶ 7–9.)  After removing duplicates and other invalid records, the Settlement Administrator initiated direct email or mail notice to 85,307 Class Members on October 14, 2021.  (Schey Decl. ¶¶ 23–25, 50.)  Of the email notices, 628 "bounced back" or were otherwise undeliverable.  (Id. ¶ 24.)

The Settlement Administrator issued postcard notices to those Class Members via U.S. mail. (Id. ¶ 25.)  DSG does not state whether any of the mailed notices were returned as undeliverable, and, if so, whether notice was re-mailed to any of those Class Members.  The Settlement Administrator declares that the direct email and mailed notices "reached a substantial portion of the Settlement Class."  (Id. ¶ 27.)

Publication Notice: DSG provided publication notice through targeted internet advertisements on ComScore Ranked Tier I websites, such as Verizon, Google, and Facebook, over thirty days from October 14, 2021 to November 13, 2021.  (Id. ¶¶ 34, 39, 53; id., Ex. E.)  The advertisements generated impressions, and the selected websites reached at least 70% or higher of the Internet population.  (Id. ¶¶ 34–35.)  In addition, DSG used targeted native ads and targeted "search terms" advertisements on popular search engines and networks.  (Id. ¶¶ 36–37.)  For example, DSG targeted adults in the United States known to have purchased "make-up," "beauty," or "cosmetic" products.  (Id. ¶ 38.)  All advertisements were written in clear and concise language and linked to the Settlement Website.  (Id. ¶ 40.)  During the notice period, DSG monitored the performance of the advertisements and made adjustments to ensure the most effective reach.  (Id.)  The publication notice plan, which was designed to leave over 12 million targeted Internet impression, generated 12,938,309 impressions.  (Id. ¶¶ 39, 53; Suppl. Schey Decl. ¶ 13.)

Press Release: On October 14, 2021, DSG released a press release through PR Newswire. (Schey Decl. ¶ 42; "Press Release," Schey Decl., Ex. F.)  The Settlement Administrator declares that PR Newswire is the industry's largest content distribution network reaching more than 4,000 U.S. websites, nearly 3,000 media outlets, and more than 550 news content systems. (Schey Decl. ¶ 42.)  The Press Release includes information about the case, as well as the process and relevant deadlines to file a claim, object, or opt-out.  (See Press Release.)

Settlement Website: DSG created a Settlement Website for Class Members to learn about the Agreement: www.neonobsessionssettlement.com.  (Schey Decl. ¶ 44.)  The website went live on October 13, 2021.  (Id. ¶ 49.)  The Settlement Website has online claim filing capabilities and features the ability to download all relevant documents, including Claim Forms, Class Notice, the Agreement, and the MPA Order.  (Id. ¶¶ 45–46.)  If the Court approves the MFA, DSG will also post that order to the Settlement Website.  (Id. ¶ 45.)  As of April 14, 2022, the Settlement Website has received 201,445 unique visitors.  (Suppl. Schey Decl. ¶ 12.)

Other Communication: DSG also established a toll-free number with an Interactive Voice Response system to answer questions and receive messages and claims-related requests and created a dedicated P.O. Box address for settlement communications.  (Schey Decl. ¶ 13.)  As of April 14, 2022, the toll-free number received 184 inbound calls for a total of 253.2 minutes, with 19 calls that left voice messages.  (Suppl. Schey Decl. ¶ 12.b.)

Supplemental Notice: On June 6, 2022, DSG issued a supplemental notice to 7,157 claimants, requesting verification of the information submitted in their Claim Forms.  (2d Suppl. Schey Decl. ¶ 3.)  DSG completed this final notice and verification process on June 16, 2022.

The deadline for Class Members to file claims, opt-out, or object to the Agreement was January 12, 2022. (Schey Decl. ¶ 58.) As of December 12, 2021, DSG had received 83,606 claims for a total estimated value of $2,853,732.00 and average estimated payment of $34.13 per claimant. (Id. ¶ 55.) Following review and audit of the claims, DSG approved a total of 64,075 valid claims for a total payment of $1,930,805.00 as of June 16, 2022. (2d Suppl. Schey Decl. ¶ 7.) Of these claims, 3,434 claims were from claimants who received a notice or provided a proof of purchase, for a total of 6,755 products and a monetary value of $195,895.00; and 60,641 claims were from claimants without proof of purchase for a total of 173,491 products. (Id. ¶¶ 6a-b.)

The Settlement Administrator declares that DSG received zero objections and one opt-out request. (Schey Suppl. Decl. ¶ 14; id., Ex. G; 2d Schey Suppl. Dec., Ex. G.) At the June 13, 2022 hearing, Plaintiffs' counsel confirmed that this remained the case.

### III.   MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

The Court first considers Plaintiffs' unopposed motion to finally approve the parties' Agreement. (See MFA.)

### A.  Legal Standard

Class action settlements must be approved by the Court. See Fed. R. Civ. P. 23(e). Whether to approve a class action settlement is "committed to the sound discretion of the trial judge." Class Plaintiffs v. Seattle, 955 F.2d 1268, 1276 (9th Cir. 1992). A strong judicial policy favors settlement of class actions. Id.

Nevertheless, the Court must examine the settlement as a whole for overall fairness. Cheng Jiangchen v. Rentech, Inc., 2019 WL 5173771, at *5 (C.D. Cal. Oct. 10, 2019) (citing Hanlon v. Chrysler Corp., 150 F.3d 1011, 1026 (9th Cir. 1998)). Neither district courts nor appellate courts have the power to delete, modify, or substitute provisions in the negotiated settlement agreement. Hanlon, 150 F.3d at 1026. "The settlement must stand or fall in its entirety." Id.

In order to approve a class action settlement, the Court must conduct a three-step inquiry. See Adoma v. Univ. of Phoenix, Inc., 913 F. Supp. 2d 964, 972 (E.D. Cal. 2012). First, it assesses whether the parties have met notice requirements under the Class Action Fairness Act. Id. Next, it determines whether the notice requirements of Federal Rule of Civil Procedure 23(c)(2)(B) have been satisfied. Id. Finally, the Court must find that the proposed settlement is fair, reasonable, and adequate under Rule 23(e)(2). Id.

//
//
//
//

## B.  Class Action Fairness Act ("CAFA")

The parties invoke federal jurisdiction pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d).  (Consolidated Compl. ¶ 27.)  CAFA requires the following notice procedure:

> Not later than 10 days after a proposed settlement of a class action is filed in court, each defendant that is participating in the proposed settlement shall serve [notice of the proposed settlement] upon the appropriate State official of each State in which a class member resides and the appropriate Federal official….

28 U.S.C. § 1715(b).  The statute provides detailed requirements for the contents of such notice. Id.  A court is precluded from granting final approval of a class action settlement until the notice requirement is met:

> An order giving final approval of a proposed settlement may not be issued earlier than 90 days after the later of the dates on which the appropriate Federal official and the appropriate State official are served with the notice required under [28 U.S.C. § 1715(b)].

28 U.S.C. § 1715(d).

Huda Beauty provided CAFA notice on all appropriate State or Federal officials on December 21, 2021.  (MFA Reply at 1.)  The notices were served more than ninety days prior to the June 13, 2022 hearing date.  At the hearing, Huda Beauty confirmed that CAFA notice had been provided.  Accordingly, the Court finds that the CAFA notice requirements have been satisfied.

## C.  Rule 23(a) and (b) Requirements

In the MPA Order, the Court certified the Settlement Class in this matter under Rules 23(a) and 23(b)(3).  (MPA Order at 6–8, 12.)  The Settlement Class is defined as follows:

> All persons residing in the United States (including all territories and/or possessions) who purchased the Products for personal use (and not for resale) through the date of Preliminary Approval.

(Agreement ¶ 1.28.)

The Court "need not find anew that the settlement class meets the certification requirements of Rule 23(a) and (b)."  Adoma v. Univ. of Phx., Inc., 913 F. Supp. 2d 964, 974 (E.D. Cal. 2012); see also Harris v. Vector Mktg., 2012 WL 381202, at *3 (N.D. Cal. Feb. 6, 2012) ("As a preliminary matter, the Court notes that it previously certified … a Rule 23(b)(3) class … [and thus] need not analyze whether the requirements for certification have been met

and may focus instead on whether the proposed settlement is fair, adequate, and reasonable.”); <u>In re Apollo Grp. Inc. Sec. Litig.</u>, 2012 WL 1378677, at \*4 (D. Ariz. Apr. 20, 2012).  Here, the Settlement Class has not changed since it was conditionally certified.  (MFA at 8.)  Because all of the criteria for class certification remain satisfied, the Court hereby confirms its order certifying the Settlement Class.

## D.  Rule 23(c)(2) Notice Requirements

Rule 23(c)(2)(B) requires that the Court “direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort.”  Fed. R. Civ. P. 23(c)(2)(B).  Similarly, Rule 23(e)(1) requires that a proposed settlement may only be approved after notice is directed in a reasonable manner to all class members who would be bound by the agreement.  Fed. R. Civ. P. 23(e)(1).

The Court approved the Class Notice form and plan in the MPA Order.  (MPA Order at 13.)  As discussed above, the Schey Declaration represents that DSG completed notice in accordance with the procedures approved by the Court.  (<u>See</u> Schey Decl.)  As of December 12, 2021, only one Class Member has opted out, and the Settlement Administrator has not received any objections.  (<u>Id.</u> ¶ 54.)  The Settlement Administrator confirms that no additional opt-out requests or objections had been received as of June 16, 2022.  (2d Suppl. Schey Decl. ¶ 5.)  Accordingly, the Court concludes that the Class Notice provided was the best notice practicable under the circumstances.  This factor weighs in favor of final approval.

## E.  Fair, Reasonable, and Adequate

Under Rule 23(e), “the claims, issues, or defenses of a certified class may be settled … only with the court’s approval.”  Fed. R. Civ. P. 23(e).  “The primary concern of [Rule 23(e)] is the protection of those class members, including the named plaintiffs, whose rights may not have been given due regard by the negotiating parties.”  <u>Officers for Justice v. Civil Serv.</u>, 688 F.2d 615, 624 (9th Cir. 1982).  The Court’s inquiry is procedural in nature.  <u>Id.</u>  Pursuant to Rule 23(e)(2), “[i]f the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate.”  Fed. R. Civ. P. 23(e)(2).  Here, the Court held a final approval hearing on May 2, 2022.

In addition, the Court must determine whether a settlement agreement is fair, adequate, and reasonable to all concerned.  The Court may consider some or all of the following factors:

(1) the strength of the plaintiff’s case;
(2) the risk, expense, complexity, and likely duration of further litigation;
(3) the risk of maintaining class action status throughout the trial;
(4) the amount offered in settlement;
(5) the extent of discovery completed, and the stage of the proceedings;
(6) the experience and views of counsel;
(7) the presence of a governmental participant; and

(8) any opposition by class members.

Linney v. Cellular Alaska P'ship, 151 F.3d 1234, 1242 (9th Cir. 1998).  This list of factors is not exhaustive, and a court may balance and weigh different factors depending on the circumstances of each case.  See Torrisi v. Tucson Elec. Power Co., 8 F.3d 1370, 1376 (9th Cir. 1993).

### 1.  Strength of Plaintiffs' Case

The initial fairness factor addresses Plaintiffs' likelihood of success on the merits.  See Rodriguez v. W. Publ'g Corp., 563 F.3d 948, 964–65 (9th Cir. 2009).  To determine the probability of Plaintiffs' success on the merits, there is no "particular formula by which that outcome must be tested."  Id. at 965.

In the MPA Order, the Court noted that absent settlement, Plaintiffs would have to prevail over Huda Beauty's likely arguments that: (1) Plaintiffs' adulterated/misbranding claims were subject to the primary jurisdiction of the U.S. Food and Drug Administration ("FDA"); (2) different websites depicted differing claims for the Products during the time they were on the market; (3) Huda Beauty never expressly made any claims on the Product packaging about application to the eye area; (4) Huda Beauty did disclose on the packaging that the Products are not "intended" for the eye area; (5) Plaintiffs cannot establish that the Products are "worthless", nor can they certify a class under a "full refund" damages model; and (6) the Products are "specialty" products marketed to highly sophisticated makeup enthusiasts.  (MPA Order at 10.)  Each of these arguments weakens Plaintiffs' claims and increases the risks Plaintiffs would face at class certification, summary judgment, and trial.  Plaintiffs assert that Huda Beauty continues to deny Plaintiffs' allegations and would present a strong defense.  (MFA at 10–12.)  Accordingly, the Court concludes that this factor weighs in favor of final approval.

### 2.  Risk, Expense, Complexity, and Likely Duration of Further Litigation

To assess the risk, complexity, and likely duration of further litigation, the Court evaluates the time and cost required.  "[U]nless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results."  Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc., 221 F.R.D. 523, 526 (C.D. Cal. 2004) (quoting 3 Newberg on Class Actions § 11:50 (4th ed. 2012)).

As discussed above, the Court determined in the MPA Order that Plaintiffs would face risks at class certification, summary judgment, and trial, as well as financial burdens, to continue litigating this case.  (MPA Order at 10.)  Plaintiffs represent that these challenges remain.  (MFA at 10.)  They also maintain that they are unlikely to achieve a greater monetary recovery through trial than the amount offered in the Agreement.  (Id. at 11–12.)  Accordingly, the Court finds that the risk, expense, and likely duration of further litigation weigh in favor of final approval.

//
//

**CIVIL MINUTES—GENERAL**              Initials of Deputy Clerk MG

### 3. Amount Offered in Settlement

To determine whether the amount offered in settlement is fair, a court compares the settlement amount to the parties' estimates of the maximum amount of damages recoverable in a successful litigation. In re Mego Fin. Corp. Sec. Litig., 213 F.3d 454, 459 (9th Cir. 2000). "Even a fractional recovery of the possible maximum recovery amount may be fair and adequate in light of the uncertainties of trial and difficulties in proving the case." Millan v. Cascade Water Servs., 310 F.R.D. 593, 611 (E.D. Cal. 2015).

The Agreement provides (1) $29.00 per Product, with a maximum of three units, for Class Members who receive direct notice or provide proofs of purchase, and (2) $10.00 per Product, up to three Products, for Class Members without a proof of purchase. (Agreement ¶ 5.1.) The retail price of the Products was $29.00 per unit. (MFA at 12.) The benefit of $10.00 per unit for claims without proof of purchase comports to the profit that Huda Beauty realized from the sale of each unit. (Id. at 12 n.6.)

Plaintiffs assert that the payment of $29.00 per unit is more than Class Members could realistically hope to recover through a favorable trial verdict because it is a full refund. (Id. at 12.) Only Plaintiffs' CLRA claim allows recovery of damages, while Plaintiffs may seek restitution under the UCL. (Id.) Plaintiffs represent that neither remedy is likely to compensate Class Members in the amount of a full refund. (Id.) The CLRA measures the difference between the price paid for the Products and what the market value would have been had the appropriate disclosures been made, while the UCL provides a full refund only if a consumer "received no value" from the Product. (Id.) Plaintiffs contend that Huda Beauty intended to argue that the Products were not worthless and that it is entitled to a "set off," which would have further discounted the recovery amount. (Id. at 12–13.) In light of Plaintiffs' challenges to prevailing on its claims, the Court finds that the settlement amount offered is fair and adequate and provides meaningful relief to Class Members. See In re Mego, 213 F.3d at 459 (finding that settlement amount that was "roughly one-sixth of the potential recovery" was reasonable "given the difficulties in proving the case"). Moreover, the Court agrees with Plaintiffs that the injunctive relief provided by the Agreement is of high value. (MFA at 13.) Accordingly, this factor weighs in favor of final approval.

### 4. Extent of Discovery Completed and the Stage of the Proceedings

This factor requires the Court to evaluate whether "the parties have sufficient information to make an informed decision about settlement." Linney, 151 F.3d at 1239. "The parties must … have engaged in sufficient investigation of the facts to enable the court to intelligently make an appraisal of the settlement." Acosta v. Trans Union, LLC, 243 F.R.D. 377, 396 (C.D. Cal. 2007) (internal quotation marks omitted). "[A]pproval of a class action settlement is proper as long as discovery allowed the parties to form a clear view of the strengths and weaknesses of their cases." Lewis v. Starbucks Corp., 2008 WL 4196690, at *6 (E.D. Cal. Sept. 11, 2008).

---

Here, settlement occurred at a relatively early stage, prior to any substantive motions and class certification. (MFA at 15.) Even so, Plaintiffs engaged in investigations and informal discovery prior to settlement discussions. (Id. at 14–15.) As noted in the MPA Order, Plaintiffs worked with a cosmetic chemist consultant and cosmetics manufacturing consultant to understand the formulation and regulatory issues related to the Products; reviewed packaging and advertisements of the Products; conducted field research at various Sephora locations to obtain evidence of in-store displays, marketing, and placement of the Products; reviewed sales and related documents; and reviewed information regarding the chemical formulation of the products, among other investigation. (MPA Order at 9.) Plaintiffs then engaged in discussions with Huda Beauty, and confirmed where the Products were sold, the sales price, and the product life cycle. (Id.) Class Counsel declares that the settlement negotiations were conducted at arms-length at all times and with a clear view of the strengths and weaknesses of the case. (Farnese Decl. ¶ 17.) Accordingly, the Court finds that this factor weighs in favor of final approval.

### 5.  Experience and Views of Counsel

"Great weight is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation." Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc., 221 F.R.D. 523, 528 (C.D. Cal. 2004) (internal citation and quotation marks omitted). Here, Class Counsel has extensive experience in consumer class actions, including with respect to the advertising and regulation of dietary supplements, cosmetics, and other health-related products. (Farnese Decl. ¶¶ 11–16; Cohen Decl. ¶ 7.) Class Counsel believes that the Agreement provides exceptional results for the Class. (MFA at 16.) Therefore, this factor weighs in favor of final approval.

### 6.  Presence of Government Participant

No governmental entity is present in this litigation. (MFA at 16.) This factor is thus neutral.

### 7.  Opposition by Class Members

The existence of overwhelming support for a settlement agreement by the class lends weight to a finding that the settlement agreement is fair, adequate, and reasonable. DIRECTV, Inc., 221 F.R.D. at 529 ("It is established that the absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members." Here, DSG provided direct emailed and mailed notice to 85,307 Class Members, of which 628 emailed notices "bounced back" and were issued postcard notices via U.S. mail. (Id. ¶¶ 23–25, 50.) In his June 16, 2022 declaration, the Settlement Administrator states that DSG only received one opt-out request and zero objections throughout the claims period, which closed on January 12, 2022. (2d Suppl. Schey Decl. ¶ 5.) The Court finds the low number of opt-outs and absence of objections probative of the reasonableness of the Agreement. Accordingly, this factor weighs in favor of approval.

In sum, the Court concludes that all factors weigh in favor of approval. Accordingly, the Court GRANTS the MFA.

## IV. MOTIONS FOR ATTORNEY'S FEES AND COSTS

The Court next considers Class Counsel's requests for attorneys' fees and costs. Pursuant to the Agreement, Class Counsel may seek attorneys' fees. (Agreement ¶ 8.1.) While the Agreement does not specify an amount, Huda Beauty agrees to pay attorneys' fees in the amount approved by the Court. (Id.) Class Counsel submit two separate motions for attorneys' fees for Ms. Ramirez and Ms. Linarte's respective counsel, rather than one motion for Class Counsel, because they were unable to agree on the amount due each firm: (1) the Ramirez Fee Motion, and (2) the Linarte Fee Motion. (See Ramirez Fee Mot.; Linarte Fee Mot.) Huda Beauty opposes the Ramirez Fee Motion as unreasonable but does not oppose the Linarte Fee Motion. (See Ramirez Fee Mot. Opp'n; Linarte Fee Mot. Opp'n.)

### A. Legal Standard

Rule 54(d)(2) of the Federal Rules of Civil Procedure ("Rule 54(d)(2)") governs the procedure for requesting attorney's fees. While the rule specifies that requests shall be made by motion "unless the substantive law governing the action provides for the recovery of . . . fees as an element of damages to be proved at trial," the rule does not itself authorize the awarding of fees. "Rather, [Rule 54(d)(2)] and the accompanying advisory committee comment recognize that there must be another source of authority for such an award . . . [in order to] give [] effect to the 'American Rule' that each party must bear its own attorneys' fees in the absence of a rule, statute or contract authorizing such an award." MRO Commc'ns, Inc. v. AT&T Co., 197 F.3d 1276, 1281 (9th Cir. 1999).

In class actions, statutory provisions and the common fund exception to the "American Rule" provide that authority for awarding attorneys' fees. See Newberg on Class Actions § 14.1 (4th ed. 2005) ("Two significant exceptions [to the 'American Rule'] are statutory fee-shifting provisions and the equitable common-fund doctrine."). Rule 23(h) authorizes a court to award "reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). Under normal circumstances, once it is established that a party is entitle to attorneys' fees, "[i]t remains for the district court to determine what fee is 'reasonable.'" Hensley v. Eckerhart, 461 U.S. 424, 433 (1983).

Courts are obligated to ensure that the attorneys' fees awarded in a class action settlement are reasonable, even if the parties have already agreed on an amount. In re Bluetooth Headset Prods. Liab. Litig., 654 F.3d 935, 941 (9th Cir. 2011). The Court, in its discretion, may award attorneys' fees in a class action by applying either the lodestar method or the percentage-of-the-fund method. Fischel v. Equitable Life Assurance Soc'y, 307 F.3d 997, 1006 (9th Cir. 2002). Because the Agreement here does not establish a common fund, the Court applies the lodestar method here to determine whether the requested attorneys' fees are reasonable.

The Court determines the lodestar amount by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate.  McGrath v. County of Nevada, 67 F.3d 248, 252 (9th Cir. 1995).  The hourly rates used to calculate the lodestar must be "in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation."  Blum v. Stenson, 465 U.S. 866, 895 n.11 (1984).  Next, the Court must decide whether to adjust the "presumptively reasonable" lodestar figure, upward or downward, based upon the factors listed in Kerr v. Screen Extras Guild, Inc., 526 F.2d 67, 69–70 (9th Cir. 1975), abrogated on other grounds by City of Burlington v. Dague, 505 U.S. 557 (1992), that have not been subsumed in the lodestar calculation.  See Caudle v. Bristow Optical Co., Inc., 224 F.3d 1014, 1028–29 (9th Cir. 2000).

These factors include:

(1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the 'undesirability' of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.

Kerr, 526 F.2d at 70.  The fee applicant holds the "burden of showing that the claimed rate and number of hours are reasonable."  Blum v. Stenson, 465 U.S. 886, 897 (1984).

**B.  Ramirez Fee Motion**

Ms. Ramirez's counsel ("Ramirez Counsel") requests approval of $717,408.45[1] in attorneys' fees and $923.59 in costs.  (Straus Joint Response Decl. ¶ 4; Ramirez Fee Mot. at 9.)  Specifically, they request the following:

| Attorney / Biller | | Hours | Hourly Rate | Lodestar |
|---|---|---|---|---|
| **(Formerly Whitfield Bryson LLP)** | | | | |
| Caroline Taylor | Partner | 120.55 | $750.00 | $90,412.50 |
| Daniel Bryson | Partner | 10 | $875.00 | $8,750.00 |
| Alex Straus | Attorney | 209.6 | $750.00 | $157,200.00 |
| Devon Landman | Attorney | 0.6 | $575.00 | $345.00 |

---

[1] Ramirez Counsel requests $716,240.00 in attorneys' fees in the Ramirez Fee Motion. (Ramirez Fee Mot. at 9.)  However, as discussed below, the Court's own calculation of Ramirez Counsel's lodestar based on the number of hours submitted and the requested hourly rates is $717,408.45.

| | | | | |
|---|---|---|---|---|
| Joan Tyson | Paralegal | 7.6 | $200.00 | $1,520.00[2] |
| Jordan Crowe | Paralegal | 6 | $200.00 | $1,200.00 |
| Tracy Smith | Paralegal | 3 | $200.00 | $600.00 |
| Amanda Mkamanga | Paralegal | 0.5 | $200.00 | $100.00 |
| Christina Marrero | Paralegal | 0.3 | $200.00 | $60.00 |
| Jeff Stein | Paralegal | 0.3 | $200.00 | $60.00 |
| Scott Heldman | Paralegal | 0.1 | $200.00 | $20.00 |
| **SUBTOTAL** | | **358.55** | | **$260,267.50**[3] |
| **(Formerly Greg Coleman Law, P.C.)** | | | | |
| Jonathan Cohen | Partner | 166.4 | $750.00 | $124,800.00 |
| Gregory Coleman | Partner | 7.1 | $875.00 | $6,212.50 |
| Mark Silvey | Partner | 4.3 | $750.00 | $3,225.00 |
| Adam Edwards | Partner | 1.6 | $800.00 | $1,280.00 |
| Will Ladnier | Attorney | 131.7 | $575.00 | $75,727.50 |
| Cathy Bryant | Paralegal | 17.1 | $200.00 | $3,420.00[4] |
| Renee Pothier | Paralegal | 4.5 | $208.00 | $936.00 |
| Amy Fox | Paralegal | 3.65 | $200.00 | $730.00 |
| Dawn Holt | Paralegal | 3.2 | $250.00 | $800.00 |
| Analise Silva | Paralegal | 2.3 | $206.00 | $473.80 |
| Evon Weston | Paralegal | 1.5 | $200.00 | $300.00 |
| Lisa Maxwell | Paralegal | 0.3 | $200.00 | $60.00 |
| Gracie Velasco | Paralegal | 0.2 | $200.00 | $40.00 |
| **SUBTOTAL** | | **343.85** | | **$218,004.80** |
| **COMBINED SUBTOTAL** | | **702.4** | | **$478,272.30**[5] |
| 1.5 Multiplier | | | | $239,136.15 |
| **TOTAL** | | | | **$717,408.45** |

//
//
//

---

[2] Ramirez Counsel declares that Ms. Tyson's lodestar is $2,860.00.  (Straus Joint Response Decl. ¶ 24.)  However, the Court's own calculation of 7.6 hours at $200.00 per hour yields $1,520.00.

[3] Ramirez Counsel represents the subtotal as $260,247.50.  (Ramirez Reply at 7.)  However, the Court's own calculation yields $260,267.50.

[4] Ramirez Counsel declares that Ms. Bryant's lodestar is $1,520.00.  (Straus Joint Response Decl. ¶ 24.)  However, the Court's own calculation of 17.1 hours at $200.00 per hour yields $3,420.00.

[5] Ramirez Counsel represents the combined subtotal as $478,272.80.  (Straus Joint Response Decl. ¶ 24.)  However, the Court's own calculation yields $478,272.30.

### 1. Hourly Rate

Ramirez Counsel requests the following hourly rates for its attorneys:

| Gregory Coleman | Partner | $875.00 |
|---|---|---|
| Daniel Bryson | Partner | $875.00 |
| Adam Edwards | Partner | $800.00 |
| Jonathan Cohen | Partner | $750.00 |
| Alex Straus | Attorney | $750.00 |
| Caroline Taylor | Partner | $750.00 |
| Mark Silvey | Partner | $750.00 |
| Will Ladnier | Attorney | $575.00 |
| Devon Landman | Attorney | $575.00 |

Ramirez Counsel submits the attorneys' resumes and 2017 billing rates for firms with significant offices in California. Though Ramirez Counsel does not provide any proof that its attorneys have been approved at the requested rates in the past, the Court finds that the hourly rates are justified by the attorneys' experience and the comparable billing rates. Accordingly, the hourly rates above are reasonable.

Ramirez Counsel requests, without explanation or support, a wide variation in hourly rates for its paralegals, ranging from $200 per hour to $260 per hour. This Court has recently approved a rate of $200 per hour for paralegals. See Donastorg v. City of Ontario, 2021 WL 6103545, at *9 (C.D. Cal. Sept. 23, 2021). Accordingly, the Court finds that a rate of $200 per hour for all paralegals in this case is reasonable.

### 2. Hours Billed

Ramirez Counsel's lodestar calculation accounts for 702.4 hours. [6] Huda Beauty argues that Ramirez Counsel improperly block-billed, overstaffed the case, and duplicated the work of Linarte Counsel. (HB Response at 2–5.) Based on the submitted timesheets, the Court agrees that some of the time spent on the case was improperly billed or unreasonable.

First, Ramirez Counsel uses block billing. In general, courts look unfavorably on block billing in timesheets because it "does not allow the Court to scrutinize the amount of time spent performing each task." Rahman v. FCA US LLC, -- F. Supp. 3d --, 2022 WL 1013433, at *4 (C.D. Cal. Mar. 29, 2022) (internal citations omitted). A court may "reduc[e] or eliminat[e] certain claimed hours" based on such billing practices, but it may not "deny[] all fees." Mendez v. County of San Bernardino, 540 F.3d 1109, 1129 (9th Cir. 2008), overruled on other grounds by

---

[6] In the Joint Response, Ramirez Counsel represents the total number of hours worked as 701.8. (Joint Response at 2.) However, the Court's own calculation shows that the total hours billed are 702.4. This figure comports also comports with Ramirez Counsel's calculations in the Ramirez Reply. (Ramirez Reply at 8–9.)

Arizona v. ASARCO LLC, 773 F.3d 1050 (9th Cir. 2014).  Here, the Court finds that the following attorneys' time entries are impermissibly block-billed: Jonathan Cohen (7/9/20, 9/7/20, 11/18/20, 12/10/20), Caroline Taylor (5/5/20, 4/27/20), and Will Ladnier (12/6/21).  Accordingly, the Court reduces these block-billed hours by 10%.[7]  See Banas v. Volcano Corp., 47 F. Supp. 3d 957, 968 (N.D. Cal. 2014) (recognizing "a district court's authority to reduce block-billed hours by 10% to 30%).  Mr. Cohen's time is reduced by 2.0 hours, Ms. Taylor's time is reduced by 0.63 hours, and Mr. Ladnier's time is reduced by 0.46 hours.

Second, Ramirez Counsel seeks to recoup time spent on clerical tasks.  The lodestar calculation cannot include "purely clerical or secretarial tasks."  Missouri v. Jenkins by Agyei, 491 U.S. 274, 288 n.10 (1989); see also Nadarajah v. Holder, 569 F.3d 906, 921 (9th Cir. 2009).  This Court has previously found that "copying and scanning documents and calendaring dates" are "purely clerical tasks," whereas "prepar[ing ] a letter to opposing counsel requesting production of documents," "prepar[ing ] deposition notices," "reviewing and organizing case files and creating and updating pleading clips" are not purely clerical tasks.  Smith v. County of Riverside, 2019 WL 4187381, at *8 (C.D. Cal. June 17, 2019).  Here, paralegals Jeff Stein, Scott Heldman, Joan Tyson, Tracy Smith, Amy Fox, Renee Pothier, Cathy Bryant, and Dawn Holt include multiple entries for calendaring deadlines, uploading and downloading files, and receiving documents.  These tasks are purely clerical or secretarial.  Accordingly, the Court deducts hours spent on such tasks from their respective time billed.

Third, some time entries for Devon Landman and Christina Marrero are billed without any explanation of what the task entailed.  Accordingly, the Court deducts these hours.

Finally, the Court agrees with Huda Beauty that Ramirez Counsel overstaffed the case.  A court may reduce Class Counsel's hours "if the case was overstaffed and hours are duplicated."  Chalmers v. City of Los Angeles, 796 F.2d 1205, 1210 (9th Cir. 1986).  Here, six partners, three attorneys, and fifteen paralegals worked for one of the plaintiffs.  Though the Court notes that Ramirez Counsel was initially represented by two firms that merged, this alone fails to explain why each person was necessary.  Ramirez Counsel undertook the following actions in this case: (1) conducted a pre-suit investigation and interview of potential class representatives, (2) filed the Complaint, (3) engaged with an expert, (4) drafted discovery requests, (5) conducted settlement negotiations, (6) prepared and filed the motions for consolidation, (7) prepared and filed the motions for preliminary settlement approval, and (8) prepared and filed the instant Motions.  (Joint Response at 4.)  While a few attorneys seem to have taken lead roles on some of the tasks, multiple attorneys appear to have mostly edited or reviewed documents—if even that.  For example, Ramirez Counsel asserts that Mr. Ladnier "researched, drafted, and edited numerous filings and reviewed all documents when filed."  (Straus Joint Response Decl. ¶ 19.)  But the Court's review of his timesheet shows that much of his 131.7 hours billed are for "emails."  (Id., Ex. A at 35.)  Accordingly, the Court is unpersuaded that Ramirez Counsel staffed the case efficiently.  Rather than reduce any one person's hours, the Court will consider whether a negative multiplier is appropriate.

---

[7] The Court rounds this figure up to the nearest tenth decimal place.

### 3. Multiplier

Ramirez Counsel seeks a lodestar multiplier of 1.5.  (Joint Response at 3; <u>see</u> Ramirez Fee Mot.)  Ramirez Counsel's adjusted lodestar with the Court's reductions is $473,252.50.  With the multiplier, Ramirez Counsel would seek a total of $709,878.75 in attorneys' fees, as reflected below:

| Attorney / Biller | | Hours | Hourly Rate | Lodestar |
|---|---|---|---|---|
| **(Formerly Whitfield Bryson LLP)** | | | | |
| Caroline Taylor | Partner | **119.9** | $750.00 | **$89,925.00** |
| Daniel Bryson | Partner | 10 | $875.00 | $8,750.00 |
| Alex Straus | Attorney | 209.6 | $750.00 | $157,200.00 |
| Joan Tyson | Paralegal | **6.5** | $200.00 | **$1,300.00** |
| Jordan Crowe | Paralegal | 6 | $200.00 | $1,200.00 |
| Tracy Smith | Paralegal | **1.8** | $200.00 | **$360.00** |
| Amanda Mkamanga | Paralegal | 0.5 | $200.00 | $100.00 |
| Christina Marrero | Paralegal | **0.1** | $200.00 | **$20.00** |
| **SUBTOTAL** | | 354.4 | | **$258,855.00** |
| **(Formerly Greg Coleman Law, P.C.)** | | | | |
| Jonathan Cohen | Partner | **164.4** | $750.00 | **$123,300.00** |
| Gregory Coleman | Partner | 7.1 | $875.00 | $6,212.50 |
| Mark Silvey | Partner | 4.3 | $750.00 | $3,225.00 |
| Adam Edwards | Partner | 1.6 | $800.00 | $1,280.00 |
| Will Ladnier | Attorney | **131.2** | $575.00 | **$75,440.00** |
| Cathy Bryant | Paralegal | **14.0** | $200.00 | **$2,800.00** |
| Renee Pothier | Paralegal | **4.4** | **$200.00** | **$880.00** |
| Amy Fox | Paralegal | **0.6** | $200.00 | **$120.00** |
| Dawn Holt | Paralegal | **1.4** | **$200.00** | **$280.00** |
| Analise Silva | Paralegal | 2.3 | **$200.00** | **$460.00** |
| Evon Weston | Paralegal | **1.5** | $200.00 | **$300.00** |
| Lisa Maxwell | Paralegal | 0.3 | $200.00 | $60.00 |
| Gracie Velasco | Paralegal | 0.2 | $200.00 | $40.00 |
| **SUBTOTAL** | | 332.9 | | **$214,397.50** |
| **COMBINED SUBTOTAL** | | | | **$473,252.50** |
| 1.5 Multiplier | | | | $236,626.25 |
| **TOTAL** | | | | **$709,878.75** |

Some of the <u>Kerr</u> factors weigh against a multiplier.  For example, while Ramirez Counsel spent significant time and labor to reach this Agreement, the high number of hours worked seems to partly be the result of inefficient billing.

//

However, other factors—such as the novelty and difficulty of the issues involved, the amount involved in the Agreement, the results obtained, and the preclusion of other work—weigh in favor of a multiplier.  The case involved a novel issue regarding "the marketing and labeling on a cosmetic arising from color additives not approved for 'eye area' use."  (Linarte Fee Mot. at 9–10.)  Ramirez Counsel also navigated complex questions around the notice and claims administration process.  (Joint Response at 12.)  Ramirez Counsel highlights the challenges involved in negotiating a class action settlement with Huda Beauty, as Huda Beauty negotiated a separate class settlement with a different individual who had not yet filed a case.  (Ramirez Fee Mot. 18.)  The case precluded Ramirez Counsel from accepting other work.  (Id. at 19–20.) Importantly, the Court agrees that the Agreement obtains excellent results for Class Members. Over 80,000 Class Members received notice of the Settlement Agreement, and over 70,000 claims have been approved for a total payment of $2,124,745.00 for 199,640 products.  (Suppl. Schey Decl. ¶ 15.)  All claimants who are approved will receive a cash payment, with or without proof of purchase.  Because Ramirez Counsel helped achieve strong benefits for the Class, a lodestar multiplier is warranted.  The Court GRANTS Ramirez Counsel's request for a 1.5 multiplier and APPROVES attorneys' fees in the amount of $709,878.75.

### 4. Costs

Ramirez Counsel requests $923.59 in litigation costs.  (Ramirez Fee Mot. at 28.)  Ramirez Counsel submits that the costs were for filing fees, conference calls, and research costs.  (Dkt. No. 90; Straus Decl. ¶ 32.)  These reported expenses are recoverable.  See Rutti v. Lojack Corp., Inc., 2012 WL 3151077, at *12 (C.D. Cal. July 31, 2012) ("Expenses such as reimbursement for travel, meals, lodging, photocopying, long-distance telephone calls, computer legal research, postage, courier service, mediation, exhibits, document scanning, and visual equipment are typically recoverable.").  Accordingly, the Court finds that the requested costs are reasonable.

In sum, the Court GRANTS IN PART the Ramirez Fee Motion's request for attorneys' fees and AWARDS Ramirez Counsel $709,878.75 in attorneys' fees and $923.59 in costs.

## C.  Linarte Fee Motion

Ms. Linarte Counsel requests approval of $482,786.25 in attorneys' fees and $1,199.15 in costs.  (Joint Response at 2–3; Farnese Joint Response Decl. ¶¶ 11–12.)

### 1.  Attorneys' Fees

| Attorney / Biller | | Hours | Hourly Rate | Lodestar |
|---|---|---|---|---|
| Donald A. Beshada | Partner | 55.1 | $875.00 | $48,212.50 |
| Peter J. Farnese | Partner | 405.4 | $675.00 | $273,645.00 |
| **SUBTOTAL** | | 460.5 | | $321,857.50 |
| 1.5 Multiplier | | | | $160,928.75 |
| **TOTAL** | | | | **$482,786.25** |

In support of their requested fees, Linarte Counsel submit timesheets and biographies. (See Farnese Joint Response Decl.; Linarte Fee Mot., Ex. 1.)  The Court finds that this documentation supports their hourly rates and hours worked and are reasonable.

The Court next considers Linarte Counsel's request for a 1.5 multiplier.  As noted above, both Linarte Counsel and Ramirez Counsel obtained strong results for Class Members and Named Plaintiffs.  Linarte Counsel spent substantial time and resources to prosecute the action and accepted the case on a contingent fee basis.  (Linarte Fee Mot. 8–9.)  As a small firm, Linarte Counsel had to decline several opportunities during the pendency of this case.  (Id. at 9.)  Linarte Counsel is experienced in class action litigation on consumer products.  (Farnese Decl. ¶¶ 8–14.) The case was somewhat novel as there are few consumer actions "challeng[ing] the marketing and labeling on a cosmetic arising from color additives not approved for 'eye area' use."  (Linarte Fee Mot. at 9–10.)  The case involved complex class certification issues and "threshold issues related [to] preemption and primary jurisdiction, FDA regulations, as well as liability and damages under the consumer protection statutes."  (Id. at 9.)  Under these circumstances, the Court concludes that the Kerr factors weigh in favor of an upward multiplier.  Accordingly, Linarte Counsel's requested attorneys' fees of $482,786.25 is reasonable.

### 2. Costs

Linarte Counsel request $1,199.15 in litigation costs.  (Farnese Joint Response Decl. ¶ 12.) These costs reflect filing fees, postage, Lexis Nexis and PACER fees, and service costs, which are all recoverable.  (Id. ¶ 12; id., Ex. 1 at 2.)  Rutti, 2012 WL 3151077, at *12.  Accordingly, the requested costs of $1,199.15 are reasonable.

In sum, the Court GRANTS the Linarte Fee Motion and AWARDS Linarte Counsel $482,786.25 in attorneys' fees and $1,199.15 in costs.

## V.    CONCLUSION

For the reasons above, the Court:

(1) GRANTS final settlement approval;

(2) GRANTS IN PART the Ramirez Fee Motion and AWARDS Ramirez Counsel $709,878.75 in attorneys' fees and $923.59 in costs;

(3) GRANTS the Linarte Fee Motion and AWARDS Linarte Counsel $482,786.25 in attorneys' fees and $1,199.15 in costs; and

(4) DISMISSES the Complaint WITH PREJUDICE.

**IT IS SO ORDERED.**